## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Amanda U. Ajuluchuku,                                    Civil No. 05-CV-1687
                                                         (DSD/SRN)


              Plaintiff,

v.                                               REPORT & RECOMMENDATION

U.S. Bancorp,

              Defendant

---

Amanda U. Ajuluchuku, Pro Se

Shari L. Jerde, Esq., on Behalf of Defendant

---

SUSAN RICHARD NELSON, United States Magistrate Judge

          This matter is before the Court upon Defendant's Motion and Amended Motion to Dismiss the

Complaint (Doc. Nos. 13 and 27), Plaintiff's Motions for Default Judgment (Doc. Nos. 6, 7, 8, and

12) and Plaintiff's Motion to Reclassify (Doc. No. 43). This case has been referred to the undersigned

for resolution of pretrial matters pursuant to 42 U.S.C. § 636 and Local Rule 72.1.

## I.     BACKGROUND

          Plaintiff filed this suit against Defendant, alleging claims of discrimination pursuant to the

Americans with Disabilities Act ("ADA") and the Civil Rights Act, fraud and emotional distress.

          Plaintiff alleges that in February 2005, she opened a checking account at a U.S. Bank in Las

Vegas, Nevada, with funds from her state income tax refund.  She asked whether Defendant had any

bank branches in Seattle, Washington, because she intended to conduct some business there.  An employee of Defendant informed her that there were bank branches in Seattle and also gave Plaintiff a list of all the branches in Las Vegas.  Plaintiff contends that this employee also informed her of the benefits of her checking account, including free checking, free notarization and free cashing of income tax refunds.  (Complaint, ¶¶ 1-3.)

Plaintiff alleges that in March 2005, she visited another branch of U.S. Bank in Las Vegas, the Flamingo branch, walking with the assistance of a cane.  Prior to her visit, she contends that she phoned the bank to inquire about notarization of a document.  She alleges that bank staff informed her that a notary was available and that there was no fee for bank customers.  (Id., ¶ 4.)  Plaintiff alleges that upon arrival, bank staff informed her that the notary was no longer available.  They also allegedly informed her of a $5 fee for notarizations.  When Plaintiff indicated that she had been told otherwise on the telephone, staff suggested that she visit the Las Vegas Boulevard bank branch, where there was purportedly no fee for this service.  (Id., ¶ 5.)

Plaintiff proceeded to the Las Vegas Boulevard bank branch.  She contends that it was imperative to have the document notarized because it was a necessary predicate to receiving unemployment benefits.  The branch manager charged Plaintiff $5 to notarize the paperwork.  (Id., ¶ 6.)

On Saturday, March 4, 2005, Plaintiff visited the Flamingo branch in Las Vegas to cash a state tax refund check.  (Id., ¶ 7.) Prior to visiting the branch, she telephoned to see if she could cash the check and staff informed her that she could.  (Id.)  Upon arrival, bank staff instructed Plaintiff to deposit the check into her checking account, or alternatively, go to the Las Vegas Boulevard bank branch.

2

(Id., ¶ 8.)  Plaintiff informed bank staff of her plans to travel to Seattle later that day.  She needed to cash the check so that she had money for food on the plane and for other incidental charges.  (Id., ¶ 8.) Plaintiff alleges that Defendant's staff adamantly refused to cash the check.  Staff directed her to the Las Vegas Boulevard branch, but Plaintiff reminded them that it was closed.  Plaintiff alleges that bank staff "ordered [her] to postpone her travel plans" and to travel on Monday, March 6, 2005.  Plaintiff explained that she could no longer pay her hotel expenses in Las Vegas, but bank staff refused to cash the check.  (Id., ¶ 8.) Instead, Plaintiff cashed the check at a private check cashing business, which charged her a fee for the service.  Afterwards, Plaintiff telephoned Defendant's toll-free customer service number "to report their discriminatory acts." (Id.)  On March 6, 2005, Plaintiff traveled to Seattle.  (Id., ¶ 9.)

Plaintiff avers that since March or April of 2005, she has regularly deposited checks into her checking account via an ATM.  She prefers to use an ATM, rather than a bank, due to her disability, because she experiences difficulty standing for long periods of time and is concerned about falling down.  (Id., ¶ 10.)

On Sunday, July 24, 2005, Plaintiff deposited a check for $30 and she expected to be able to withdraw that amount.  Prior to making the deposit, Plaintiff's bank balance was $0.97.   After depositing the $30, Plaintiff withdrew that same amount.  (Id., ¶ 12.)

Approximately four days later, the owner of the $30 check telephoned Plaintiff, indicating that the bank would return the check to Plaintiff unpaid, due to an error.  This person advised Plaintiff to re-deposit the check and stated that he would assume responsibility for any service charge levied by Defendant.  (Id., ¶¶ 12-13.)

Plaintiff telephoned Defendant's customer service number to inquire about service charges. Defendant's customer service representative advised Plaintiff that the check had not bounced, but suggested that she wait for approximately three days and inquire again. The customer service representative also informed Plaintiff that Defendant would charge a $6 fee for the returned check, but that Plaintiff would be able to re-deposit the check via an ATM and her card privileges would be unaffected. (Id., ¶ 14.)

On August 1, 2005, Plaintiff received the check in the mail as well as a service charge statement from Defendant. In addition to the $6 fee for the bounced check, Plaintiff was charged $30. (Id., ¶ 16.) Later that day, Plaintiff visited Defendant's branch bank on Fourth Avenue and University Street in Seattle to re-deposit the check and complain about the service charge. She attempted to make the deposit at the bank's ATM, but was unable to do so because Defendant had deactivated the card. Plaintiff went inside the bank and spoke with the bank manager. In the presence of other customers, Plaintiff alleges that the bank manager stated, "U.S. Bank has deactivated your card because you withdrew the $30.00 before you deposited the check." (Id., ¶ 17.)

Plaintiff disputed that, indicating that she was an accountant and that an ATM would not give her $30 unless her account contained $30. Plaintiff asked that her account be credited, but the bank manager refused. (Id., ¶ 18.) Plaintiff reached for her pocket book, recalling that she had ATM receipts. At this time, she felt extremely dizzy and sat down in a chair. "The chair almost yanked my head off. It somersaulted me forwards and backwards before landing me on my injured foot." The bank manager inquired if Plaintiff was alright. (Id., ¶ 19.)

Plaintiff managed to find the receipts, at which time the bank manager agreed with Plaintiff that

she had deposited the check prior to withdrawing the money.  (Id., ¶ 20.)

Plaintiff alleges that as a result of her fall on August 1, 2005, she sustained head and foot

injuries.  The following day, August 2, 2005, Plaintiff experienced headaches and tingling in her foot

which prompted her to dial 911.  An ambulance transported her to a Seattle hospital where she

received an injection and medication for her pains.  (Id., ¶ 21.)

## II.   PARTIES' POSITIONS

In its motion to dismiss, Defendant argues that Plaintiff's claims under the ADA and the  Civil

Rights Act should be dismissed pursuant to Fed. R. Civ. P. 12(b)(1) for lack of subject matter

jurisdiction.  Defendant contends that the remedies available for violations of the applicable provisions

of the statutes are limited to injunctive relief.  Defendant argues that Plaintiff lacks standing, noting that

she has failed to allege any "real and immediate threat" of future harm from Defendant.  (Def.'s Mem. in

Supp. Am. Mot. Dismiss at 5-10.)  Plaintiff has not demonstrated that she is likely to use any of the

three bank branches described in her Complaint, nor does she currently reside in the states where those

branches are located, Defendant argues.  In addition, Defendant contends that Plaintiff fails to allege

that even if she were to patronize one of Defendant's branch banks in the future, that Defendant or its

employees would discriminate against her.  (Id.)

Defendant further argues that Plaintiff's Civil Rights and ADA claims fail on the merits.  As to

the Civil Rights claim, Defendant argues that it is not a place of public accommodation as defined by the

statute, and even if it were, Plaintiff has failed to satisfy the procedural prerequisites for bringing such a

claim.  (Id. at 10-12.)

Defendant argues that Plaintiff's fraud claim and emotional distress claims should be dismissed

5

for failure to state a claim upon which relief may be granted, as set forth in Federal Rule of Civil

Procedure 12(b)(6).  Regarding the fraud claim, Defendant argues that Plaintiff's fraud claim lacks the

showing of particularity required by Federal Rule of Civil Procedure 9(b) and that Plaintiff has not

alleged damages stemming from Defendant's allegedly fraudulent conduct.  (Id. at 13-19.)

Plaintiff's negligent infliction of emotional distress claim, Defendant argues, fails to allege either

physical impact or evidence of serious emotional distress resulting in physical injury or illness, or allege

that Defendant's negligent conduct placed Plaintiff in peril.  (Id. at 20, 22.)  Similarly, Defendant

contends that Plaintiff's intentional infliction of emotional distress claim fails because it lacks the requisite

elements of: (1) extreme and outrageous conduct with the intention of, or reckless disregard for, causing

emotional distress; (2) severe or extreme emotional distress suffered by the plaintiff; and (3) actual or

proximate causation.  (Id. at 21-23.)

Plaintiff responds that the Complaint alleges physical injury to the head and foot and consequent

emotional distress.  As to alleging discrimination under the ADA, Plaintiff argues that Defendant's

branch bank refused the free notarization service because of her physical disability.  Plaintiff disavows

any procedural requirement that she report her injury to any state-level authorities.

In addition, Plaintiff moves this Court for permission to reclassify, or construe, certain of her

allegations under a theory of personal injury premises liability.  She contends that when she filed this

suit, she checked a box on the Civil Cover Sheet indicating the nature of the suit was "Other Civil

Rights," and she believed that she could only check one box.  Now, she wishes to reclassify her suit as

"Other Personal Injury."  Defendant objects to Plaintiff's motion.  Defendant notes that it did not

construe Plaintiff's Complaint under a premises liability theory, other than to the extent that personal

injury liability forms part of Plaintiff's emotional distress claims. However, even assuming that Plaintiff's Complaint could be construed to contain a premises liability theory, Defendant contends that the allegations contained in the Complaint do not support such a theory of liability.

Finally, Plaintiff moves for default judgment, arguing that Defendant failed to serve an Answer to the Complaint. Defendant points to Federal Rule of Civil Procedure 12(b), which allows a defendant to file a motion, rather than an answer, as a responsive pleading to a complaint.

## II.    DISCUSSION

When considering a motion to dismiss for failure to state a claim upon which relief may be granted under Federal Rule of Civil Procedure 12(b)(6), "we must assume that all the facts alleged in the complaint are true" and generally construe the complaint in the light most favorable to the plaintiff. E.g., Coleman v. Watt, 40 F.3d 255, 258 (8th Cir. 1994). Although "the complaint must contain sufficient facts, as opposed to mere conclusions, to satisfy the legal requirements of the claim to avoid dismissal," DuBois v. Ford Motor Credit Co., 276 F.3d 1019, 1022 (8th Cir. 2002), a court "may dismiss 'only if it is clear that no relief can be granted under any set of facts that could be proved consistent with the allegations.'" E.g., Frey v. City of Herculaneum, 44 F.3d 667, 671 (8th Cir. 1995). Furthermore, the Eighth Circuit has held that pro se complaints are to be liberally construed. See Atkinson v. Bohn, 91 F.3d 1127, 1128 (8th Cir. 1996).

In addition to moving to dismiss based upon Rule 12(b)(6), Defendant also moves to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(1). If a plaintiff lacks standing, the district court has no subject matter jurisdiction. Friedmann v. Sheldon Community. Sch. Dist., 995 F.2d 802, 804 (8th Cir.1993). The Eighth Circuit has held that a standing argument implicates Rule 12(b)(1). See Faibisch

v. Univ. of Minnesota, 304 F.3d 797, 801 (8th Cir. 2002).

### A.      Civil Rights Act and ADA Claims

Plaintiff alleges discrimination based on race and disability pursuant to the Americans with

Disability Act ("ADA") and the Civil Rights Act of 1964 (Counts C, E and F.)  Although Plaintiff does

not identify the specific provisions of these Acts that Defendant allegedly violated, the Court agrees with

Defendant that Plaintiff's claims are grounded in Title III of the ADA, 42 U.S.C. § 12182, and Title II

of the Civil Rights Act, 42 U.S.C. § 2000a.

Section 12182 of the ADA prohibits discrimination by public accommodations on the basis of

disability and § 2000a prohibits discrimination in places of public accommodation on the bases of race,

color, religion or national origin.  The remedy available for violations of these provisions is injunctive

relief. See 42 U.S.C. § 12188(a)(1); 42 U.S.C. § 2000a-3(a).  In its discretion, a court may award the

prevailing party reasonable attorney's fees.  Monetary relief, however, is not available under Title III of

the ADA.  See Powell v. Nat'l Bd. of Med. Examiners, 364 F.3d 79, 86 (2d Cir. 2004); Dorsey v.

City of Detroit, 157 F.Supp. 2d 729, 733 (E.D. Mich. 2001).  Likewise, monetary relief is not

available under Title II of the Civil Rights Act.  See Newman v. Piggie Park Enterprises, 390 U.S. 400,

402 (1968); Lyle v. Village of Golden Valley, 310 F.Supp. 852, 855 (D. Minn. 1970).  Plaintiff seeks

eight trillion dollars in damages and her Complaint does not request injunctive relief.  While these

discrimination claims could be dismissed on this basis, the Court instead examines whether Plaintiff

possesses standing to assert a claim for injunctive relief.

### 1.      Standing

Article III of the Constitution limits the jurisdiction of the federal courts to "cases" and

"controversies."  The party invoking federal jurisdiction bears the burden of establishing the three

constitutional prerequisites for standing: (1) the invasion of a legally protected interest which is (a)

concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical; (2) an injury

fairly traceable to the challenged action of the opposing party; and (3) the likelihood, as opposed to

speculation, that the injury will be redressed by a favorable court decision.  Lujan v. Defenders of

Wildlife, 504 U.S. 555, 560-61 (1992) (internal citations and quotations omitted); American Ass'n of

Orthodontists v. Yellow Book USA, Inc., 434 F.3d 1100, 1103 (8th Cir. 2006).

In addition, in cases involving injunctive relief, a district court may issue an injunction if it

concludes that there is a cognizable threat of recurrent violations – more than a mere possibility.  Dyer

v. Securities and Exchange Commission, 291 F.2d 774 (8th Cir. 1961); see also, United States v.

Articles of Drug, 825 F.2d 1238, 1248 (8th Cir. 1987) (district court may issue injunction if it

concludes that injunction is necessary to prevent future violations).  Discussing standing in a case

involving injunctive relief, the Supreme Court has observed that "[p]ast exposure to illegal conduct does

not in itself show a present case or controversy regarding injunctive relief . . . if unaccompanied by any

continuing, present adverse effects." City of Los Angeles v. Lyons, 461 U.S. 95, 102 (1983) ((citing

O'Shea v. Littleton, 414 U.S. 488, 495-496 (1974)).

Lyons involved a plaintiff who alleged that he had been subject to an illegal police choke hold,

461 U.S. at 97, and O'Shea involved a class of plaintiffs who claimed that they had been subjected to

discriminatory enforcement of the criminal law by a county magistrate and judge, 414 U.S. at 488.  In

both cases, while the Supreme Court acknowledged that the plaintiffs had been subject to a past

wrong, standing for injunctive relief depended upon whether plaintiffs would suffer future injury

stemming from the same allegedly wrongful conduct.  See Lyons, 461 U.S. at 105; O'Shea, 414 U.S. at 493-94.  The Court concluded in both cases that the threat of future harm, i.e., that plaintiffs would engage in criminal conduct, bringing them into contact with the defendants, was too remote to confer standing.  Lyons, 461 U.S. at 110; O'Shea, 414 U.S. at 497.

A similar conclusion was reached in an ADA discrimination suit, where the court concluded that allegations of past harm did not confer standing upon a plaintiff seeking injunctive relief.  Aikins v. St. Helena Hosp., 843 F.Supp. 1329 (N.D. Cal. 1994).  In Aikins, the plaintiff, who was deaf, alleged that the defendants violated the ADA by failing to provide an interpreter to enable her to communicate with hospital staff when her husband was admitted in critical condition.  Id. at 1331-32.  The court, citing Lyons, stated that the plaintiff had failed to allege a real and immediate threat of future harm because she had not shown that it was likely that she would use the hospital again in the near future.  In addition, the court concluded that it was unlikely that the hospital would discriminate against her again if she were to use the hospital in the future: "The Court cannot infer from Mrs. Aikins's limited experience with [the defendants] that defendants routinely fail to comply with applicable anti-discrimination statutes."  See id. at 1334; see also, Shotz v. Cates, 256 F.3d 1077, 1081 (11th Cir. 2001) (stating, "In ADA cases, courts have held that a plaintiff lacks standing to seek injunctive relief unless he alleges facts giving rise to an inference that he will suffer future discrimination by the defendant."); Atakpa v. Perimeter Ob-Gyn Assocs., P.C., 912 F.Supp. 1566, 1573 (N.D. Ga. 1994) (dismissing plaintiff's claim for lack of standing where plaintiff failed to demonstrate that she was likely to use the defendant health care provider in the near future, nor if she did use the defendant as her health care provider, that they would discriminate against her).

Here, Plaintiff's allegations of harm occurred in the past.  She alleges that Defendant: (1) charged her a $5.00 notarization fee in March 2005; (2) denied her the opportunity to cash a state income tax refund check in March 2005 at a U.S. Bank location in Nevada; (3) charged a fee for a bounced check; (4) deactivated her ATM card; and (5) injured her by way of a faulty chair, from which she fell.  (Complaint, ¶¶ 4-8; 12-21.)  Plaintiff, however, does not allege that she is likely to use any of the three branch banks described in her Complaint, or any of Defendant's branch banks for that matter, in the near future, nor does she reside in Nevada or Washington.  (See Notice of New Address and Telephone Number, Doc. No. 47.)  Moreover, as in Aikins, Shotz and Atakpa, discussed above, Plaintiff has failed to demonstrate that even if she were to visit one of Defendant's branch banks in the future, that Defendant would discriminate against her.  Accordingly, the Court concludes that Plaintiff has failed to allege the constitutional requirements for Article III standing to seek injunctive relief.  The Court recommends that her claims under the ADA and the Civil Rights Act be dismissed.[1]

### B.      Fraud Claim

Plaintiff's fraud count consists of the sole allegation, "Defendant defrauded me many times." (Complaint, Count D.)  Plaintiff presumably asserts her fraud claims under state common law, for which the substantive state laws of Nevada and Washington apply.  See Erie R. Co. v. Tompkins, 304 U.S. 64, 78 (1938).  However, in procedural matters, such as pleadings, federal courts apply the Federal Rules of Civil Procedure.  Bank of St. Louis v. Morrissey, 597 F.2d 1131, 1134-35 (8th Cir. 1979) (citations omitted).  Federal Rule of Civil Procedure 9(b) requires that when pleading a claim of fraud,

---

[1]Because the Court concludes that Plaintiff lacks Article III standing to pursue these claims, the Court does not address the merits of Plaintiff's Civil Rights and ADA claims.

"the circumstances constituting fraud or mistake shall be stated with particularity." The Eighth Circuit has explained that, for Rule 9(b), " '[c]ircumstances' include such matters as the time, place and contents of false representations, as well as the identity of the person making the misrepresentation and what was obtained or given up thereby.... [C]onclusory allegations that a defendant's conduct was fraudulent and deceptive are not sufficient to satisfy the rule." Parnes v. Gateway 2000, Inc., 122 F.3d 539, 549 (8th Cir. 1997) (citing Commercial Property Invs., Inc. v. Quality Inns Int'l, Inc., 61 F.3d 639, 644 (8th Cir.1995)).

### 1.    Fraud Under Nevada Law

To establish a fraud claim under Nevada law, a plaintiff must prove the following: (1) that the defendant made a false representation of fact; (2) that the defendant knew or had reason to know the representation was false; (3) that the representation was made for the purpose of inducing the plaintiff to act or refrain from acting; (4) that the plaintiff's reliance on the misrepresentation was reasonable; and (5) that the plaintiff suffered damage as a result. See Bulbman, Inc. v. Nevada Bell, 825 P.2d 588, 592 (Nev. 1992).

### a.    Notarization Fee

Plaintiff alleges that in March 2005, she phoned the Flamingo bank branch in Las Vegas to inquire about notarizing a document. She alleges that bank staff informed her that a notary was available and that there was no fee for bank customers. (Id., ¶ 4.) Plaintiff went to this branch, but was told that the notary was no longer available and that notarization would cost $5. When Plaintiff indicated that she had been told otherwise on the telephone, bank staff suggested that she visit a branch of Las Vegas Boulevard, where there was no fee for this service. (Id., ¶ 5.) At the Las Vegas

12

Boulevard bank branch, Plaintiff contends that she met with the manager, who ultimately charged her $5 for the notarization.  (Id., ¶ 6.)

Plaintiff claims that Defendant falsely represented that a free notary was available.  As to this allegation of fraud, Plaintiff's claim fails.  Even assuming that Defendant made a false representation of fact, Plaintiff makes no claim that Defendant knew or had reason to know that the representation was false.  Nor does Plaintiff allege that the representation was made for the purpose of inducing Plaintiff to make an unnecessary trip to the Flamingo branch, or to expend $5.  In addition, the only damage alleged is that Plaintiff paid $5 for the notarization of documents, which Plaintiff chose to pay.  Based on Plaintiff's representation that it was imperative that the document be notarized, it is likely that Plaintiff intended to have the document notarized, fee or no fee.  Based on all of the above, the Court finds that, as a matter of law, Plaintiff fails to state a claim for fraud as it relates to paying the $5 notarization fee in Nevada.  Accordingly, the Court recommends that this claim be dismissed.

### b.      Cashing Income Tax Refund

On Saturday, March 4, 2005, Plaintiff visited the Flamingo branch in Las Vegas to cash a state tax refund check.  (Id., ¶ 7.) Prior to visiting the branch, she telephoned to see if she could cash the check and staff informed her that she could.  (Id.)  When she arrived, she was told that she could deposit the check into her checking account, or alternatively, go to the Defendant bank branch at Las Vegas Boulevard.  (Id.)  Plaintiff informed bank staff of her plans to travel to Seattle later that day, telling them that she needed to cash the check to pay for travel expenses.  (Id.)  When Plaintiff reminded bank staff that the Las Vegas Boulevard branch was closed because it was a Saturday, she alleges that bank staff "ordered [her] to postpone her travel plans" and to travel on Monday, March 6,

2005.  Plaintiff explained that she could no longer pay her hotel expenses in Las Vegas and when bank

staff still refused to cash the check, she cashed it at a private check cashing business, for which she

incurred a fee. (Id.)  On March 6, 2005, Plaintiff traveled to Seattle.  (Id., ¶ 9.)

Plaintiff's fraud claim with respect to this incident is based on the purported misrepresentation

from the Flamingo bank branch that it would be able to cash Plaintiff's state income tax check.  Plaintiff

fails to articulate any facts purportedly known by Defendant's employees showing that they knew or

had reason to know of any misrepresentation.  Under Nevada law, "mere failure to fulfill a promise or

perform in the future . . . will not give rise to a fraud claim absent evidence that the promisor had no

intention to perform at the time the promise was made." Bulbman, Inc, 825 P.2d at 592. Even

assuming that Defendant knew or had reason to know that the statement about cashing the income tax

check was false, Plaintiff fails to allege that Defendant made the statement for the purpose of inducing

her to make an unnecessary trip to the bank.   Finally, the only damage that Plaintiff sustained was the

fee for cashing the check.  As Plaintiff alleges that she did not travel to Seattle until May 6 – the date

that the Las Vegas Boulevard branch was open – she could have visited that branch and cashed the

check then.  Based on all of the above, the Court concludes that Plaintiff's fraud claim with respect to

the Nevada check cashing incident fails as a matter of law and should be dismissed.

### 2.      Fraud Under Washington Law

Under Washington law, a plaintiff must prove the following elements to establish a claim of

fraud: (1) representation of an existing fact; (2) materiality; (3) falsity; (4) the speaker's knowledge of

its falsity; (5) intent of the speaker that it should be acted upon by the plaintiff; (6) plaintiff's ignorance

of its falsity; (7) plaintiff's reliance on the truth of the representation; (8) plaintiff's right to rely upon it;

14

and (9) damages suffered by the plaintiff.  <u>Stiley v. Block</u>, 925 P.2d 194, 204 (Wash. 1996).

The facts supporting Plaintiff's fraud claim in Washington are that on Sunday, July 24, 2005, Plaintiff deposited a check for $30 and expected to be able to withdraw that amount.  Prior to making the deposit, Plaintiff's bank balance was $0.97.   After depositing the $30, Plaintiff withdrew $30. (Complaint, ¶ 12.)  This would have returned her bank balance to $0.97.

Approximately four days later, the owner of the $30 check informed Plaintiff that the check was going to be returned to Plaintiff unpaid due to an error.  This person agreed to assume responsibility for any service charge levied by Defendant as a result of the bounced check.  (<u>Id.</u>, ¶¶ 12-13.)

Plaintiff contacted Defendant and was informed that the bank would levy a $6 fee for the returned check, but that Plaintiff would be able to re-deposit the check via an ATM and that the bounced check would not affect her card privileges.  (<u>Id.</u>, ¶ 14.)

On August 1, 2005, Plaintiff received the check in the mail as well as a service charge statement from Defendant.  In addition to the $6 fee for the bounced check, Plaintiff was charged an additional $30.  (<u>Id.</u>, ¶ 16.)  Plaintiff visited Defendant's branch bank in Seattle to re-deposit the check and complain about the service charge.  She attempted to make the deposit at the bank's ATM, but was unable to do so because Defendant had deactivated the card.  Defendant's staff informed Plaintiff that her card had been deactivated because she had withdrawn money before making a deposit.  (<u>Id.</u>, ¶ 17.)

Plaintiff disagreed and asked that her account be credited, but the bank manager refused. (<u>Id.</u>, ¶ 18.)  Plaintiff asserts that she produced her ATM receipts showing that the deposit was made prior to the withdrawal.  (<u>Id.</u> ¶¶ 19-20.)

Plaintiff's Complaint makes clear that she deposited $30, withdrew $30, and the check subsequently bounced, leaving her with $0.97 in her account. Based on her own allegations, Plaintiff withdrew funds that she ultimately did not have. As to fraud allegations based on these facts, Plaintiff fails to state a claim upon which relief can be granted. First, no statement, misrepresentation or false statement is at issue. Also, even if there were a statement, Plaintiff fails to set forth any facts indicating that Defendant knew of its falsity. Finally, the fact that the owner of the check agreed to pay any service charge, dispenses with Plaintiff's claim of damages.

## C.   Emotional Distress

Plaintiff's "Mental or Emotional Distress" count alleges that she has "suffered disappointments, embarrassment, humiliation, anger, more panic attacks, memory loss, seizures, dizziness, and anxiety." (Complaint, Count G.) As with her fraud claims, Plaintiff presumably asserts her emotional distress claims under state common law, for which the substantive state laws of Nevada and Washington apply. Because Plaintiff fails to specify whether her claims are for negligent infliction of emotional distress ("NIED") or intentional infliction of emotional distress ("IIED"), the Court addresses whether her allegations state a claim under both theories of liability.

### 1.   Emotional Distress Under Nevada Law

Under Nevada law, a claim for NIED requires physical impact, or, in the absence of physical impact, evidence of "serious emotional distress" resulting in physical injury or illness. See Olivero v. Lowe, 995 P.2d 1023, 1026 (Nev. 2000) (citations omitted). In Chowdhry v. NLVH, Inc., 851 P.2d 459, 462 (Nev. 1993), the Nevada Supreme Court determined that insomnia and general physical or emotional discomfort are insufficient to satisfy the physical impact requirement. Absent physical impact,

16

the plaintiff must present proof of "serious emotional distress" causing physical injury or illness. Barmettler v. Reno Air, Inc., 956 P.2d 1382,1386-87 (Nev. 1998).

To state a claim for IIED, a plaintiff must allege the following: (1) extreme and outrageous conduct with either the intention of, or reckless disregard for, causing emotional distress; (2) severe or extreme emotional distress suffered by the plaintiff; and (3) actual or proximate causation.  Jordan v. State ex rel. Dep't of Motor Vehicles, 110 P.3d 30, 52 (Nev. 2005).  The plaintiff's complaint must specifically allege intent.  Id.

Plaintiff's emotional distress claim is premised on the provision of conflicting information regarding a $5 notarization fee and her inability to immediately cash a check.  While Plaintiff describes injuries in the form of disappointments, embarrassment, humiliation, anger, panic attacks, memory loss, dizziness, and anxiety, her Complaint fails to allege either physical impact, or evidence of "serious emotional distress" causing physical injury or illness as a result of Defendant's alleged actions in Nevada.  The Court concludes that her NIED claim under Nevada law fails and therefore should be dismissed.

Likewise, Plaintiff's IIED claim under Nevada law fails.  Plaintiff does not specifically allege intent, nor is the conduct at issue (the $5 notarization fee and the inability to cash a check) extreme or outrageous, as a matter of law.  Because Plaintiff fails to state an IIED claim upon which relief can be granted, the Court recommends its dismissal.

### 2.     Emotional Distress Claims Under Washington Law

Liability for negligence is contingent upon establishing duty, breach, causation and injury. See Bishop v. State, 889 P.2d 959, 962 (Wash. Ct. App. 1995) (citation omitted).   A defendant

17

owes a duty of care only to those who are foreseeably endangered by the defendant's conduct.

See Hunsley v. Giard, 553 P.2d 1096, 1103 (Wash. 1976).  In addition, "unless the defendant's

conduct is unreasonably dangerous, the defendant owes no duty."  Keates v. City of Vancouver, 869

P.2d 88, 93 (Wash. Ct. App. 1994).  Under Washington law, liability for NIED is limited to "plaintiffs

who are actually placed in peril by the defendant's negligent conduct. . . ."  Cunningham v. Lockard,

736 P.2d 305, 308 (Wash. Ct. App. 1987); see also Kloepfel v. Bokor, 66 P.3d 630, 633-34 (Wash.

2003) (stating that Washington courts have "distinguished negligent infliction of emotional distress from

intentional infliction of emotional distress by making bodily harm or objective symptomatology a

requirement of negligent but not intentional infliction of emotional distress.") Moreover, a plaintiff's

emotional distress "must be the reaction of a normally constituted person."  See Hunsley, 553 P.2d at

1103.

          Plaintiff's emotional distress claims under Washington law are based on her allegations that

Defendant deactivated her ATM card and informed her of this deactivation in a humiliating way; she

was improperly charged a $36.00 fee for a bounced check; and that she suffered head and foot injuries

when she sat in a chair that caused her to tumble and land on an already injured foot.  (Complaint at ¶¶

12-21.)  Defendant's actions in deactivating Plaintiff's ATM card and later informing her of the basis

for this deactivation, are not "unreasonably dangerous" conduct.  In addition, Plaintiff was not placed in

peril by Defendant's conduct.  Although Plaintiff alleges that she sustained head and foot injuries, her

Complaint also states that her foot was previously injured.  (Id. at ¶ 19.)  Not only was Plaintiff's injury

from the chair not reasonably foreseeable, Defendant's conduct regarding the ATM deactivation, the

bounced check fee and the chair was not unreasonably dangerous.   Accordingly, as a matter of law,

Plaintiff fails to state a claim for NIED pursuant to Washington law and her claim should be dismissed.

The following elements are required to establish a claim for IIED in Washington: "(1) extreme and outrageous conduct; (2) intentional or reckless infliction of emotional distress; and (3) actual result to the plaintiff of severe emotional distress." Seaman v. Karr, 59 P.3d 701, 710 (Wash. Ct. App. 2002) (citations omitted).  A claim for IIED must be predicated on conduct that is "so outrageous in character, and so extreme in degree as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." Grimsby v. Samson, 530 P.2d 291, 295 (Wash. 1975)((quoting Restatement (Second) of Torts § 46 cmt. d (1965)). Liability does not extend to "mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities," id., but must be the type of conduct that would lead an average member of the community to exclaim, "Outrageous!" upon hearing the facts.  Kloepfel v. Bokor, 66 P.3d 630, 632 (Wash. 2003).

Again, the conduct at issue involved the deactivation of Plaintiff's ATM card, the way in which Defendant informed her of the deactivation, the bounced check and related fees and the fall from the chair.  Applying Washington's requirements for an IIED claim to the allegations in Plaintiff's Complaint, Plaintiff's claim fails.  The alleged conduct does not rise to the level of extreme and outrageous conduct that would lead a member of the community to exclaim, "Outrageous!"  While Plaintiff was undoubtedly inconvenienced and annoyed by the deactivation of her card and the accrual of fees related to the bounced check, it cannot be said, as a matter of law, that Defendant's actions in this regard were extreme and outrageous.  Likewise, Defendant may have been humiliated by the alleged way in which Defendant's staff informed her of her ATM card's deactivation, but the allegations do not describe conduct that is extreme and outrageous.  Nothing in Plaintiff's complaint indicates that the incident

19

involving the chair was foreseeable or intentional.  In fact, the Complaint indicates that following

Plaintiff's fall, Defendant's employee inquired if Plaintiff was alright.  For all of the foregoing reasons,

the Court finds that Plaintiff fails to state a claim for IIED under Washington law and that her claim

should be dismissed.

### D.   Motion to Reclassify

Plaintiff moves to "reclassify" her Complaint, essentially asking the Court to construe her causes

of action under a premises liability theory of negligence.  Plaintiff notes that when she filed her

Complaint, she completed a Civil Cover Sheet. (Attachment 2 to Complaint, Doc. No. 1.)  She

believed that she could only select one category to describe the general nature of her suit.  Under the

category "Civil Rights," Plaintiff selected "440 Other Civil Rights."   Plaintiff now seeks to reclassify her

suit under the Torts category, specifically "360 Other Personal Injury."

The Civil Cover Sheet, federal form JS 44, is applicable to all civil filings and is required for the

use of the Clerk of Court for the purpose of initiating the civil docket sheet.  (Id.)  In Section IV of the

form, "Nature of Suit," a plaintiff must indicate the general type of lawsuit at issue, e.g., contract, tort,

civil rights, social security.  Within the general categories are subcategories, e.g., under "civil rights," a

litigant may indicate whether the suit involves voting, employment, Americans with Disabilities, etc.  The

form also contains a section for citing the civil statute under which a plaintiff is filing (i.e., "VI.  Cause of

Action"), as well as a brief description of the case.  In this case, Plaintiff noted that the civil statutes

implicated in her lawsuit were the Americans with Disabilities Act and the Civil Rights Act.  (See

Attachment 2 to Complaint, Doc. 1.)

Plaintiff is correct that the Civil Cover Sheet, Form JS 44, directs a plaintiff to select only one

category that describes the nature of the suit: "Place an 'X' in One Box Only." (Id.) However, as the Local Rules state, the requirement that a complaint be accompanied by a civil cover sheet "is solely for administrative purposes, and matters appearing only on the civil cover sheet have no legal effect in the action." While the Civil Cover Sheet is procedurally required and is useful to the Clerk of Court in docketing a new complaint, it has no legal significance on the suit itself. Therefore, a "reclassification" of Plaintiff's suit would have no legal effect on her causes of action.

While the Eighth Circuit has held that pro se complaints are to be liberally construed, see Atkinson, 91 F.3d at 1128, and Federal Rule of Civil Procedure 8(f) states that "all pleadings shall be so construed as to do justice," this Court cannot read into the Complaint a cause of action, and supporting facts, that are not alleged. The Court will not construe the facts alleged to propound personal injury claims, particularly as Defendant has relied upon the Complaint and responded to those claims by way of its Motion to Dismiss. Accordingly, Plaintiff's motion to reclassify should be denied.

**E.      Motion for Default Judgment**

Plaintiff has filed several motions for default judgment, arguing that Defendant failed to timely serve and file an answer to the Complaint. Instead of filing an answer, Defendant moved to dismiss for lack of subject matter jurisdiction pursuant to Fed. R. Civ. P. 12(b)(1) and failure to state a claim upon which relief can be granted pursuant to Fed. R. Civ. P. 12(b)(6). The Rules of Civil Procedure give a responsive party the option of asserting these defenses by motion, rather than by filing an answer. Plaintiff's motions should be denied.

**THEREFORE, IT IS HEREBY RECOMMENDED THAT:**

1.      Defendant's Motion and Amended Motion to Dismiss the Complaint (Doc. Nos. 13

21

and 27) be **GRANTED**;

2.      Plaintiff's Motions for Default Judgment (Doc. Nos. 6, 7, 8, and 12) be **DENIED;** and

3.      Plaintiff's Motion to Reclassify (Doc. No. 43) be **DENIED.**

Dated:    April 24, 2006

s/Susan Richard Nelson
SUSAN RICHARD NELSON
United States Magistrate Judge

Pursuant to Local Rule 72.2 (b), any party may object to this Report and Recommendation by May 8, 2006 after being served with a copy thereof.  The objecting party must file with the Clerk of the Court and serve on all parties, written objections which specifically identify the portions of the proposed findings, recommendations, or report to which objection is being made, and a brief in support thereof. A party may respond to the objecting party's brief within ten days after service thereof.  Failure to comply with this procedure may operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.